**NOT FOR PUBLICATION**                                             **CLOSED**


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANA OLMEDO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | **Civ. Action No. 03-2386 (WHW)** |
| JO ANNE BARNHART, | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Walls, District Judge

Plaintiff Ana Olmedo ("Olmedo" or "plaintiff") seeks review of the final determination of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits and supplemental security income pursuant to 42 U.S.C. §§ 405(g) and 1383(c) (3). The Commissioner's decision to deny benefits is affirmed.

## BACKGROUND

### A.    Procedural History

Plaintiff Ana Olmedo filed applications for disability insurance benefits on October 17, 1991 and supplemental security income ("SSI") on August 16, 1994. (Tr. 74-77, 90-92). She alleged an inability to work due to "diabetes [and] blurred vision" and "dizzy spells, headaches, diabetes, vision and leg [weakness]." (Tr. 162, 98 ). The Social Security Administration ("SSA") denied both applications initially and upon reconsideration. (Tr. 93-97, 98-99). In June 1995, plaintiff filed a request for hearing before an administrative law judge ("ALJ"). (See Tr. 100-106). During this hearing, plaintiff also alleged a mental impairment. (Tr. 14). ALJ Neil

Ross vacated the SSA's denial of benefits and remanded the case for further evaluation of the new allegation. (Tr. 108-110). The SSA again determined that plaintiff was not entitled to benefits. (See Tr. 115). On December, 13, 1999, plaintiff filed a second application for SSI, alleging an inability to work as of January 1, 1992. (Tr. 135). At the final hearing, plaintiff amended the alleged onset date of her disability to December 25, 1995. (Tr. 15, 29). On July 12, 2001, ALJ Dennis G. Katz issued a partially favorable decision which found that plaintiff was disabled as of May 15, 2001, but not at any earlier date. (Tr. 359-369).

Plaintiff filed an appeal with the appeals council, which remanded the case back to ALJ Katz for reconsideration of whether plaintiff was disabled between December 25, 1995 and May 15, 2001. (Tr. 373-375). In particular, the appeals council directed the ALJ to obtain evidence from a vocational expert as to the limitations of plaintiff's occupational capabilities and to obtain evidence from a medical expert as to the severity of plaintiff's impairment. (Tr. 374). After remand, the ALJ determined that plaintiff had the capacity to perform past relevant work before May 15, 2001 and was not disabled before this date. (Tr. 19).

**B.      Personal Facts and Employment History**

Olmedo was born in 1944 (Tr. 74) in Puerto Rico and moved to the United States in approximately 1960. (Tr. 30). Her educational background has been a matter of contention due to Olmedo's inconsistent assertions. (Compare Tr. 166 with Tr. 177). On one application, Olmedo indicated that she had been educated up to the seventh grade (Tr. 166), but on a later form she represented that she only had a fourth grade education. (Tr. 177). Additionally, Olmedo's ability to speak and write the English language has been disputed. Although Olmedo was assisted by an Spanish interpreter throughout the trial, she indicated on several SSA forms

NOT FOR PUBLICATION                                                    CLOSED

that she was capable of speaking and/or reading English.  (Compare Tr. 168 with Tr. 170).  The

ALJ did not resolve these issues of fact but determined that these inconsistencies revealed

Olmedo as a less-than-credible witness.  (Tr. 18).

        From 1979 to 1983, Olmedo worked in a printing shop.  (Tr. 160).  Her sole function in

the shop was to print designs on t-shirts, which did not require her to use any machinery.  (Id).

This job involved sitting for six hours, constant bending, and required no lifting.  (Id).  From

1984 until 1991,  Olmedo was employed as a factory worker, who trimmed and packaged rubber

gloves.  (Tr. 157, 166).  Her factory job involved walking for five hours, standing for six hours

and frequent bending.  (Tr. 157).  She frequently had to lift and carry over 30 pounds and

occasionally up to 40 pounds.  (Tr. 167).  In her disability report, Olmedo alleged that she left

her factory job because her diabetic condition caused dizziness and did not permit her to work

standing on her feet all day.  (Tr. 162).  She also alleges constant fatigue, blurred vision and

numbness in her lower extremities.  (Tr. 162, 171, 180).  Olmedo testified that she did not

receive public assistance and that her husband supported her.  (Tr. 33-34).

**C.    Medical History**

        Plaintiff was first diagnosed on record with non-insulin dependent diabetes[1] in 1990.  (Tr.

188.)  Between 1990 and 1992, plaintiff was hospitalized multiple times for uncontrolled

diabetes, but was only treated with oral medication.  (Tr. 187-214.)  In February 1992, plaintiff

was examined by Dr. Wilchfort.  (Tr. 215-216.)  This examination showed that plaintiff's blood

---

[1]  Non-insulin dependant diabetes is "an often mild form of diabetes mellitus" with a gradual
onset.  STEDMAN'S MEDICAL DICTIONARY 473 (26th ed. 1995).  It most frequently occurs
in obese individuals over the age of 35.  Id.  This form of diabetes "responds well to dietary
regulation and/or oral [medication], but diabetic complication and degenerative changes can
develop."  Id.

NOT FOR PUBLICATION                                    CLOSED

pressure was slightly  elevated, her vision without glasses was 20/200 on the right and 20/40 on

the left, and decreased vibratory sense in the toes of her left foot.  Id.  Plaintiff was taking

Micronase in order to control her diabetes and no medication for blood pressure.  (Tr. 215.)

Other than these findings, nothing else of significance was revealed by the examination.

Moreover, plaintiff displayed a normal range of motion and a normal gait.  (Tr. 216.)

Dr. Bharaj and Dr. Nott reported in July and August of 1999 that plaintiff suffered from

mild diabetes.  (Tr. 289, 293).  Both doctors indicated in their reports that plaintiff exhibited

moderate diabetic neuropathy.[2]  Id.

Dr. Green, a retinal specialist, examined plaintiff on October 5, 1999.  (Tr. 260.)  He

found that plaintiff's uncorrected vision was 20/400 in the right eye and 20/70-2 in the left eye.

Id.  Plaintiff informed the doctor that she had only perceived a decrease in her vision within the

past few months and spots in her right eye within the past few weeks.  Id.   In summary, the

examination showed that plaintiff had background diabetic retinopathy[3] in both eyes with

ischemic changes[4], and she was advised to control her blood pressure.  Id.  Later, plaintiff

---

[2]  Neuropathy is "a generic term for any diabetes mellitus-related disorder of the nervous system."  Id. at 1204.  Plaintiff suffers from peripheral neuropathy, one of the most common complications of diabetes.  Id.  Peripheral neuropathy "causes a dulling of the sensations of pain, temperature and pressure, especially in the lower legs and feet and may be treated with drugs." Id.

[3]  Diabetic retinopathy is a "noninflammatory degenerative disease of the retina" in which "blood leakage and fluid buildup from deteriorating and weakly-formed new blood vessels initially cause macular edema" and, if left untreated, scarring and retinal detachment result.  Id. at 1538-39.  Such retinal changes occur in diabetes of long duration and are marked by hemorrages and microaneurysms.  Id.  Approximately forty percent of diabetics exhibit retinopathy to a degree.  Id.

[4] Ischemic changes are a diminishment of the blood supply in the retina as a result of failure of the arterial circulation.  Id. at 894.  Permanent blindness may result.  Id.

underwent laser photocoagulation treatments in both eyes.  (Tr. 276.)  On February 7, 2000, Dr. Green reexamined plaintiff after the treatments and reported that her visual acuity had improved to 20/60-2 in the left eye and finger counting at six feet in the right eye.  Id.  In May, 2001, Dr. Green opined that plaintiff's activities were only limited by her vision, not by any other physical ailment.  (Tr. 333.)

On May 14, 2001, plaintiff was examined by Dr. Mendoza, after further deterioration of her eyesight.  (Tr. 356.)  Dr. Mendoza found that her corrected vision was 20/400 in the right eye and 20/40 in the left eye with constriction of the peripheral vision and active diabetic retinopathy in both eyes.  Id.  Dr. Mendoza concluded that plaintiff was disabled.  (Tr. 357.)

Dr. Bernanke, a state agency medical consultant, reviewed the record and testified as the medical expert during the final hearing in March 2003.  (Tr. 51-64.)  Dr. Bernanke found that plaintiff had been hospitalized numerous times for diabetes during the 1990s as a result of noncompliance with treatment, which he attributed to family and/or financial factors.  (Tr. 53.)  Having reviewed these past records, Dr. Bernanke concluded that oral medication kept plaintiff's diabetes under control until 1998 when she began to use insulin.  (Tr. 52).

In Dr. Bernanke's opinion, the medical record contained little evidence to suggest that plaintiff had a significant uncorrectable left eye impairment before 1999.  (Tr. 53-55; see  Tr. 260).  Dr. Bernanke noted that doctors had first found diabetic changes to the eye lenses in 1999 and that plaintiff had informed Dr. Green in October 1999 that she had noticed decreased vision over the past few months.  (Tr. 58; see Tr. 260).

Dr. Bernanke testified that plaintiff's condition did not meet or equal one of the impairments listed in Appendix 1 before the May 15, 2001 onset date determined by the ALJ.

(Tr. 56, 62).  Dr. Bernanke opined that although plaintiff's uncorrected vision was problematic

for her distance vision, the reports indicated that her near vision could be improved by

eyeglasses.  (Tr. 59-60).  The records showed that plaintiff had reported she was able to self-

administer her insulin injections.  (Tr. 62).  Dr. Bernanke opined that an individual needed

"reasonably decent" close vision to read syringe markings and to provide correct dosage.  Id.

    The medical expert also testified that plaintiff had diabetic neuropathy and that there was

decreased vibratory sensation in her left foot in 1992.  (Tr. 61; see Tr. 216 (involving only the

toes of the left foot)).  However, the doctor noted that the record was devoid of similar reports.

(Tr. 61).  Moreover, Dr. Bernanke observed that there were no reports of cardiac disease, stroke,

or kidney problems.  (Tr. 61.)  In response to an inquiry from counsel about whether diabetes

would impose exertional limitations, the doctor replied that diabetes would cause no particular

exertional limitations.  (Tr. 63).  The medical expert stated that evaluation of the disabilities

resulting from diabetes is primarily based on end-organ damage.  Id.  If plaintiff's blood sugars

were out of control, Dr. Bernanke would have expected to see documentation of the erratic sugar

levels and of her resulting symptoms.  Id.

    Mr. Liebowitz testified as the vocational expert at the final hearing.  (Tr. 64-71; see Tr.

414-15).  He was familiar with plaintiff's vocational background.  (Tr. 64-65).  The vocational

expert described plaintiff's work history as consisting of unskilled factory work, most recently as

a trimmer and packager, which were performed at the medium exertional level.  (Tr. 65; see Tr.

31, 156, 166, 172).  According to testimony from the vocational expert, plaintiff would not need

binocular vision to perform her past work.  (Tr. 65).  Plaintiff's past work was close-type work

NOT FOR PUBLICATION                                            CLOSED

and was bench work.  (Tr.65)  The vocational expert stated that her visual problem would not

affect her ability to perform close work during the relevant time period.  (Tr. 65-66.)

        The ALJ set forth a hypothetical of an individual of plaintiff's age, education and work

experience who did not have binocular vision, had minimal restriction in peripheral vision and

who could perform work at the medium level of exertion.  (Tr. 68).  In response to the

hypothetical, Mr. Liebowitz testified that such an individual could perform plaintiff's past

relevant work.  (Tr. 68).  Additionally, the vocational expert opined that such a person could

perform other jobs which exist in significant numbers in the national economy, such as

packaging jobs.  (Tr. 68-69).  According to Dr. Leibowitz, more than 40,000 such packaging

jobs existed in the northern New Jersey-New York area.  (Tr. 69.)

        The vocational expert opined that visual acuity would not be a major factor in packaging

jobs, unless plaintiff's vision became blurred and she frequently needed to rest her eyes.  Id.  No

danger existed from exposure to machinery, since plaintiff did not work near machines.  (Tr. 70).

Mr. Liebowitz explained that plaintiff performed bench work at a stationary work station, not

work that involved a conveyor belt.  Id.  Plaintiff's work was often performed standing, with

stools available to permit the option of sitting.  (Tr. 70-71.)


                                        **DISCUSSION**

**A.      Standard of Review: Substantial Evidence**

        This Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C.

§ 405(g).  The district court must affirm the Commissioner's decision if it is "supported by

substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Plummer v. Apfel, 186 F.3d 422 (3d

Cir. 1999) "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Metro Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  While substantial evidence must have real probative weight it "may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988)).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  Cursory conclusions unsupported by evidence cannot justify an ALJ's decision.  Id.  "[A] reviewing court may remand a case to the Secretary for good cause, 'where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979) (quoting Saldana v. Weinberger, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)).

In determining if there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) objective medical facts; (2) diagnoses and expert opinions of examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history and age."  Snee v. Sec'y of Health & Human Servs., 660 F. Supp. 736, 738 (D.N.J. 1987).  Accord Balock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972).  For this Court to properly conduct judicial review and to avoid "judicial usurpation of administrative functions" it must ensure that the "administrative decision . . . [is] accompanied

**NOT FOR PUBLICATION**                                    **CLOSED**

by a clear and satisfactory explanation of the basis on which it rests." <u>Id</u>.  Otherwise, remand is

appropriate.  <u>Cotter v. Roberts</u>, 642 F.2d 700, 705 (3d Cir. 1981).

**B.        Standard for the Commissioner's Determination of Disability**

Disability is defined by the Social Security Act as "inability to engage in any substantial

gainful activity by any reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner must follow a five-step sequential process to determine if an

applicant is disabled and eligible for Social Security disability benefits.  20 C.F.R. § 404.1520.

The Commissioner must first determine whether or not the claimant is currently engaged in

"substantial gainful activity."  <u>Plummer v. Apfel</u>, 186 F.3d 422, 428 (3d Cir. 1999).  "Substantial

gainful activity" is defined as "the performance of significant physical or mental duties . . . for

remuneration or profit."  <u>Chicager v. Califano</u>, 574 F.2d 161, 163 (3d Cir. 1978).

Second, if the claimant is not engaged in "substantial gainful activity" then the ALJ must

next determine if the claimant is suffering from a severe impairment.  <u>Plummer</u>, 186 F.3d at 428.

A severe impairment is defined as "any impairment or combination of impairments which

significantly limits the claimant's physical or mental ability to do basic work activities."

<u>Barnhart v. Thomas</u>, 124 S. Ct. 376, 379 (2003); 20 C.F.R. §§ 404.1520(c), 416.920(c).

If the claimant's impairments are severe, the ALJ must make a third determination that

they are listed in Appendix 1 to subpart P of the Social Security Regulations or are equivalent to

9

the impairments listed there.  Plummer, 186 F.3d at 428; 20 C.F.R. § 404.1520.  If the

impairments are not listed or equivalent to those listed in the appendix, then the ALJ must make

a fourth finding regarding the claimant's "residual functional capacity to perform" his or her

"past relevant work."  Id.  "Residual functional capacity is defined as what a claimant can still do

despite his limitations."  Burns, 312 F.3d at 119.

If the ALJ holds that the claimant cannot return to his or her "past relevant work" due to

the impairments, then the ALJ must determine if there are "other jobs existing in significant

numbers in the national economy which the claimant can perform," taking into account his or

her educational and work experiences.  Plummer, 186 F.3d at 428.

## ANALYSIS

In steps one and two of the sequential analysis, the ALJ concluded that plaintiff was not

engaged in substantial gainful activity and that her diabetic condition (with retinopathy and

neuropathy) and her hypertension did constitute severe impairments. (Tr. 16.)  However, at the

third step of analysis, the ALJ found that none of plaintiff's impairments (either alone or in

combination) satisfied or equaled the clinical criteria listed in appendix 1 of the regulations.  (Tr.

16.)  Since plaintiff's impairments did not meet or equal the criteria listed in appendix 1, a

determination of per se disability was not merited.  See 20 C.F.R., Part 404, Sub. P, App. 1.  The

analysis then proceeded to step four, where the ALJ found that plaintiff had failed to establish

that she lacked the "residual functional capacity" to perform her "past relevant work."  (Tr. 19).

As a result of the finding in step four, the ALJ had no need to proceed to step five.

<u>NOT FOR PUBLICATION</u>                                              **CLOSED**

    **1.  The ALJ's conclusion that plaintiff was not severely disabled as of December 25, 1995, is supported by substantial evidence.**

        **A.  The ALJ properly evaluated plaintiff's credibility in assessing her subjective complaints.**

    Plaintiff asserts that the ALJ improperly used his own judgment in finding that she was less than credible in her subjective allegations relating to her medical condition.  (Pl.'s Brf at 7.) Plaintiff also alleges that her subjective allegations can not be overlooked when these allegations are backed by documentation by both treating and testifying physicians.  <u>Id</u>.  In assessing plaintiff's credibility, the ALJ considered plaintiff's testimony, statements to doctors and reports to the SSA.  The ALJ's findings are supported by substantial evidence.

    The ALJ's evaluation of plaintiff's credibility was not "beyond meaningful judicial review."  <u>Burnett v. Commissioner of SSA</u>, 220 F.3d 112, 119-20 (3d Cir. 2000.)  An ALJ has the discretion to evaluate the credibility of a claimant and arrive at an independent judgment, in light of the medical findings and other evidence regarding the true extent of plaintiff's alleged pain and limitations.  <u>See</u>  <u>Mimms v. Secretary of Health and Human Services</u>, 750 F.2d 180, 186 (2d Cir. 1984.)

    Throughout the proceedings, plaintiff has been inconsistent in reporting her educational level and her abilities in the English language.  She first reported to the SSA that she attended school through the seventh grade.  (Tr. 166.)  Later, plaintiff reported that she had attended school only through the fourth grade.  (Tr. 177.)  During the last hearing, she testified that she

had never attended school.  (Tr. 30.)  Likewise, the SSA claims representative noted that plaintiff

spoke English during her interview at the time of her application in 1991.  (Tr. 168.)  In an SSA

form completed in 1999, plaintiff reported that she could read and write in English, but that she

could not speak English.  (Tr. 170.)  However, at trial, plaintiff testified with the aid of a Spanish

interpreter and alleged that she could not read or write in English or in Spanish.  (Tr. 30.)  The

inconsistency in plaintiff's allegations could have reasonably led the ALJ to question the

veracity of plaintiff's statement.

    In addition, the ALJ considered plaintiff's changing tales regarding eyeglasses.  Initially,

she claimed that she had never been prescribed eyeglasses, but then admitted that a prescription

had been issued to her for eyeglasses.  (Tr. 33.)  Finally, she alleged that she could not afford to

have the prescription filled.  (Tr. 33-34.)  The ALJ expressed his disbelief that, since 1998,

plaintiff and her working husband could not set aside funds for the glasses in order to improve

plaintiff's disabling vision.  Id.

    Coupled with these inconsistencies, the Commissioner correctly points out that plaintiff

is mistaken in asserting that medical testimony supports her subjective complaints of extremely

limited functioning.  Plaintiff claims that ALJ ignored the treating reports of Dr. Steven S.

Winfield, which indicated uncontrolled diabetes with retinopathy and that plaintiff's visual

acuity was effected.  (Tr. 383-894.)   However, Dr. Winfield's report covers the period between

October 11, 2002 and December 13, 2002, which is not relevant to the period in question here.

Id.  In addition, treating physicians Dr. Bharj and Dr. Nott indicated in their reports that

plaintiff's neuropathy was only moderate.  (Tr. 289, 293.)  Further, the medical advisor testified

that while plaintiff had diabetic neuropathy and in 1992 there was a report of decreased vibratory

sensation in her left foot, the doctor found it significant to note that the record was otherwise

devoid of similar reports.  (Tr. 61; see 216.)  The doctor also stated that diabetes would "not

particularly" impose exertional limitations.  (Tr. 63.)

The ALJ properly assessed the plaintiff's credibility.  The inconsistencies in her

statements and allegations were adequate grounds for the ALJ to find plaintiff's subjective

complaints to be less-than-reliable.  Since the record is devoid of medical evidence to the

contrary, the ALJ reasonably found plaintiff to be less-than-credible.

**B.  The ALJ properly distinguished between the evidence given by the
medical advisor and the evidence given by the vocational expert.**

Plaintiff argues that the ALJ erred in his findings in that he relied on the testimony of the

medical expert in assessing plaintiff's ability to do close work and fine manipulation instead of

relying on the testimony of the vocational expert.  (Pl.'s Brf. at 7.)  Plaintiff also claims that the

ALJ substituted his own opinion for the opinion of the medical advisor.  Id. The Commissioner

contends that the ALJ "properly utilized the vocational expert in the role of a vocational expert

and the medical advisor in the role of a medical advisor."  (Def.'s Brf. at 18.)  The record shows

that the Commissioner's position is correct.

The medical expert, Dr. Bernanke, testified regarding the period before May 15, 2001.

(Tr. 51-64).  The doctor stated that plaintiff's uncorrected vision was problematic for distance

vision, but that her near vision could be improved through a minor correction (eyeglasses.)  (Tr.

59-60.)  The doctor also testified that plaintiff reported she could self-administer insulin injections, which required an individual to have "reasonably decent" near vision to read the syringe markings.  (Tr. 62.)  These findings by the doctor led him to conclude that plaintiff's eyesight limitations would not prevent her from performing work that involved near vision.  (Tr. 59-60.)  However, the doctor did not opine on which specific jobs would accommodate plaintiff's physical limitations.  Dr. Bernanke's testimony was limited to offering opinions on medical issues.

Similarly, Mr. Liebowitz, the vocational expert, confined his testimony to vocational matters.  He testified that binocular vision was not necessary in order to perform her past relevant work, which consisted of bench work and close type work.  (Tr. 66.)  The vocational expert noted that plaintiff's visual condition, which was described by Dr. Bernanke, would not have affected her ability to do close work before May 15, 2001.  (Tr. 65-66.)

Additionally, the ALJ put forth a hypothetical to the vocational expert of an individual of plaintiff's age, education, and work experience, who could not see in her right eye, had some minimal restriction in her peripheral vision and who could perform work at a medium level of exertion.  (Tr. 68.)  In addressing this hypothetical, Mr. Liebowitz asserted that such an individual could perform plaintiff's past relevant work.  The vocational expert further opined that such a person could perform other jobs which existed in significant numbers in both the national economy and within the New York-New Jersey area.  (Tr. 68-69.)  Moreover, contrary to assertions made by plaintiff that the ALJ failed to include the testimony of the vocational expert, the ALJ actually identified and summarized Mr. Liebowitz's testimony.

**2.  Substantial evidence supports the ALJ's determination that plaintiff could perform  past relevant work until May 15, 2001.**

> **A.  The vocational expert opined that plaintiff could perform her past relevant work and could perform other jobs which are commonplace in the national economy.**

Plaintiff contends that the ALJ did not show or cause to be shown the reasonable availability of jobs that plaintiff was capable of performing, other than her past relevant work. (Pl.'s Brf at 9.)  The Commissioner correctly argues that the ALJ was not required to show this type of evidence to deny plaintiff's claim. (Def.'s Brf at 21-23.)

At the last hearing, Mr. Liebowitz, the vocational expert, testified regarding plaintiff's capacity to work.  (Tr. 64-71.)  He stated that plaintiff's past relevant work consisted of unskilled factory work at a medium exertional level.  The expert testified that plaintiff would not require binocular vision to perform such work.  The vocational expert opined that plaintiff was capable of performing past relevant work before May 15, 2001.   Basing his decision on this testimony, the ALJ found that plaintiff could perform her past work and decided this case at step four.  As a result, there was no need to proceed under step five.

Although unnecessary for him to do so, Mr. Liebowitz further offered his opinion that an individual with plaintiff's background and capabilities could perform other jobs, particularly packaging jobs, which existed in significant numbers in the national economy.  (Tr. 68-69.)  The vocational expert testified that over 40,000 such packaging jobs existed within the New Jersey-

New York area.  (Tr 69.)  This testimony as to the existence of jobs that plaintiff can perform is further substantial evidence in support of the Commissioner's decision.  See Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir.  1988); Sias v. Secretary of Health and Human Services, 861 F.2d 475, 480-81 (6th Cir. 1988); Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983); Accord. Craigie v. Bowen, 835 F.2d 56 (3d Cir. 1987.)

### B.  The ALJ  sufficiently attempted to develop the record.

Plaintiff asserts that the SSA must develop a complete administrative record during proceedings for disability benefits and failed to do so in the present case.  (Pl.'s Brf. at 10.) The Commissioner counters that the ALJ made sufficient efforts to develop the record by issuing multiple subpoenas and in obtaining testimony from medical and vocational experts.  (Def.'s Brf. at 20-21.)  The transcript supports the Commissioner's argument.

If a court finds that the medical documentation is unclear, it becomes incumbent upon the ALJ to secure whatever evidence she believes is needed to make a sound determination. Ferguson v. Schweiker, 765 F.2d 31, 36 (3d Cir. 1985).  However, the ALJ does not need to go to great length to develop the claimant's case, but the ALJ's duty to develop the record extends to cases where the ALJ believes that he or she is lacking information critical to the determination of a factual issue.  See Ferguson, 765 F.2d at 36; Thompson v. Califano, 556 F.2d 616, 618 (1st Cir. 1977).

In reviewing the first hearing,  the appeals council remanded this case back to the ALJ with instructions to take necessary actions to complete the administrative record.  (Tr. 373-375.)

**NOT FOR PUBLICATION**                                                **CLOSED**

Complying with this order, the ALJ obtained the testimony of Dr. Bernanke, who acted as

medical advisor to the court, and Mr. Leibowitz, a vocational expert.  (Tr. 47-72, 414-15, 417.)

In addition, the ALJ acquired a consultative eye examination from Dr. Mendoza.  (Tr. 326, 332,

356-358.)  The ALJ also obtained further information about plaintiff's condition from Dr. Green,

who had provided records before. (Tr. 322-23, 333-35.)  Both Dr. Nott and Dr. Bharaj were

issued subpoenas by the ALJ for additional records, but neither doctor responded to the request.

(Tr. 379-82, 16.)  Thus, the ALJ made sufficient attempts to develop the administrative record by

requesting additional records from treating physicians, ordering a consultative eye examination

and obtaining a medical advisor and the testimony of a vocational expert. (Pl.'s Brf. at 21.)


**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.


                                                     **s/ William H. Walls, U.S.D.J.**

17

**NOT FOR PUBLICATION**                                                  **CLOSED**